13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


EXACT SCIENCES CORPORATION, )
                           )
              Plaintiff,   )
                           ) C.A. No. 23-1319(MN)
v.                         )
                           )
GENEOSCOPY, INC.,          )
                           )
              Defendant.   )


                    Monday, May 20, 2024
                    2:00 p.m.
                    Motion Hearing


                    844 King Street
                    Wilmington, Delaware


BEFORE:  THE HONORABLE MARYELLEN NOREIKA
         United States District Court Judge



APPEARANCES:


              MORRIS NICHOLS ARSHT & TUNNELL LLP
              BY:  JACK B. BLUMENFELD, ESQ.

              -and-

              QUINN EMANUEL URQUHART & SULLIVAN LLP
              BY:  ANDREW BRAMHALL, ESQ.
              BY:  BRIAN P. BIDDINGER, ESQ.
              BY:  JIHONG LOU, ESQ.
              BY:  GAVIN FRISCH, ESQ.


                    Counsel for the Plaintiff

1    **APPEARANCES CONTINUED:**

2

3              **ASHBY & GEDDES**
              **BY:  STEVEN J. BALICK, ESQ.**

4              **-and-**

5              **FOLEY HOAG LLP**
6              **BY:  SARAH S. BURG, ESQ.**
              **BY:  DONALD R. WARE, ESQ.**

7

8                         **Counsel for the Defendant**

9

10

11                    **_ _ _ _ _ _ _ _ _ _ _ _ _**

12

13:48:10 13

13:48:10 14              THE COURT:  All right.  Good afternoon.  Please
14:07:19 15    be seated.

14:07:22 16              All right.  Let's start with some introductions.

14:07:25 17              Mr. Blumenfeld.

14:07:28 18              MR. BLUMENFELD:  Thank you, Your Honor.  Jack
14:07:32 19    Blumenfeld from Morris Nichols for the plaintiff.  And at
14:07:36 20    counsel table with me are Andrew Bramhall and Gavin Frisch
14:07:39 21    from Quinn Emanuel.  Behind them are Brian Biddinger and
14:07:45 22    Jihong Lou also from Quinn Emanuel.  There are also two
14:07:47 23    client representatives, Alexandra Gorman and Carly Conway.

14:07:52 24              THE COURT:  Thank you.

14:07:53 25              MR. BLUMENFELD:  Sorry, Your Honor, one little

14:07:54 1   point of information.  I don't know if it hit your attention

14:07:57 2   yet, but we filed a lawsuit last week on a continuation

14:08:01 3   patent.  It's Civil Action 24-583, which we assume will be

14:08:07 4   assigned to you the day after tomorrow.  I just wanted to

14:08:11 5   let you know.

14:08:12 6                   Thank you.

14:08:13 7                   THE COURT:  Mr. Balick.

14:08:17 8                   MR. BALICK:  Hello, Your Honor.

14:08:18 9                   THE COURT:  Good afternoon.

14:08:19 10                  MR. BALICK:  Steven Balick from Ashby & Geddes

14:08:22 11  on behalf of the defendant, Geneoscopy with co-counsel from

14:08:26 12  Foley Hoag, Donald Ware and Sarah Burg.

14:08:29 13                  THE COURT:  All right.  Good afternoon.

14:08:32 14                  All right.  So let me ask defendant first, what

14:08:34 15  is it that you plan to do with respect to commercial

14:08:39 16  distribution of ColoSense now that you have received FDA

14:08:42 17  approval?

14:08:44 18                  MR. WARE:  Your Honor, again, this is Donald

14:08:52 19  Ware.  The intention is to await reimbursement decision by

14:08:59 20  CMS, by Medicare, before launching the product.

14:09:03 21                  THE COURT:  What's the status of that?

14:09:06 22                  MR. WARE:  I think it's just being initiated

14:09:09 23  perhaps this week.  And I can't give you a prediction of

14:09:15 24  exactly how long that takes.  I have seen some estimates of

14:09:20 25  nine to twelve months coming from Exact, and you just wait.

14:09:26  1   But the intention is not to launch the product until

14:09:31  2   Medicare confirms a reimbursement coverage and payers which

14:09:35  3   is then usually followed by payers, insurance companies

14:09:40  4   deciding to reimburse.

14:09:41  5           We're quite a ways from launch.  The one

14:09:44  6   statement that has been made publicly by Geneoscopy is that

14:09:47  7   they are expecting launch late this year or early in 2025.

14:09:51  8           THE COURT:  All right.  Thank you.

14:09:54  9           All right.  And for the plaintiff, regarding

14:10:00 10   Count One, which is infringement, you say defendant has

14:10:08 11   already infringed the '781 patent by commercially marketing,

14:10:12 12   using, offering for sale, or selling ColoSense as a

14:10:18 13   commercial laboratory developed test in or around July 23rd

14:10:24 14   through an online website and order form.  And then you say,

14:10:29 15   it will continue to infringe by commercially making, using,

14:10:34 16   offering to sell, or selling the ColoSense upon imminent FDA

14:10:39 17   approval.  All of the claims of the '781 patent are method

14:10:43 18   claims, so you're not really arguing as you said that you

14:10:48 19   think they've infringed by offering for sale or selling.

14:10:52 20   Right?

14:10:53 21           MR. BRAMHALL:  Your Honor, this is Andrew

14:10:56 22   Bramhall from Quinn Emanuel for Exact Sciences.  Your Honor,

14:10:59 23   that's mostly a preservation point on our end.

14:11:03 24           THE COURT:  I'm asking because I'm trying to

14:11:05 25   figure out -- I understand the declaratory judgment aspect

14:11:08  1  and we'll get to that.  I'm trying to figure out, Count

14:11:12  2  One -- and Count One, where is it that you say that they

14:11:15  3  have -- you have a well-pleaded complaint that they have

14:11:20  4  used it, that doesn't fall within the Safe Harbor?

14:11:25  5          MR. BRAMHALL:  So, Your Honor, with respect to

14:11:28  6  LDT, laboratory developed tests, those are separate and

14:11:33  7  apart from the FDA approval process, so our contention at

14:11:36  8  least is with respect to any activities relating to the LDT

14:11:41  9  test.

14:11:41 10          THE COURT:  Give me a paragraph I'm supposed to

14:11:45 11  be looking at.

14:11:46 12          MR. BRAMHALL:  Sure, Your Honor.  For example,

14:11:47 13  there is a number of them.  69 is one paragraph.  This is in

14:11:52 14  the First Amended Complaint, if that's where you're looking.

14:11:56 15          THE COURT:  All right.  Let me read it.  Again,

14:12:00 16  this offered for sale, sold, marketed, that's not an act of

14:12:09 17  infringement, so I don't know why you're saying that that's

14:12:11 18  preserving something.  But it seems wrong to me and I keep

14:12:15 19  getting stuck on that.

14:12:17 20          So where is it -- I mean, what you say here is

14:12:20 21  the website advertised it.  That's not them using it.  So,

14:12:27 22  how about you give me where you have a well-pleaded

14:12:32 23  complaint that says something more than we think they used

14:12:35 24  it.

14:12:35 25          MR. BRAMHALL:  Well, so Your Honor, there is --

14:12:37  1   the website address that you're talking about was a website

14:12:42  2   for this commercial product.  It had a requisition form for

14:12:46  3   ordering the product --

14:12:47  4            THE COURT:  Not infringement.

14:12:48  5            MR. BRAMHALL:  For use, Your Honor.

14:12:49  6            THE COURT:  But it's an advertisement.  I can

14:12:51  7   advertise all kinds of stuff.  It doesn't mean anyone is

14:12:54  8   actually using it.  Maybe if they do actually sell it, it

14:12:58  9   would be an act of inducing infringement.  I'm asking where

14:13:01 10   you have alleged that they used it?

14:13:04 11            MR. BRAMHALL:  So two other paragraphs, Your

14:13:06 12   Honor.  67, and apologies for going backwards.  That's a

14:13:12 13   paragraph that talks about the development of the test, the

14:13:14 14   accused test --

14:13:15 15            THE COURT:  Where do you say how that is not

14:13:18 16   covered by the Safe Harbor?

14:13:20 17            MR. BRAMHALL:  So, Your Honor, we have

14:13:21 18   allegations in our complaint that make it very clear we're

14:13:23 19   not capturing --

14:13:24 20            THE COURT:  I'm asking you to give me your

14:13:27 21   allegations, give me a paragraph.  You're citing paragraphs

14:13:29 22   where you talk about advertising and you're giving me

14:13:33 23   paragraphs where you talk about development.  What is it

14:13:35 24   that you say is a well-pleaded paragraph that they used it

14:13:40 25   in a way that is not covered by the Safe Harbor?

14:13:44  1          MR. BRAMHALL:  So, Your Honor, the rest of that
14:13:46  2  paragraph, 67, and I would argue that overall our
14:13:49  3  allegations are --
14:13:50  4          THE COURT:  Well, I'm not doing a gestalt over
14:13:55  5  gestalt thing, I want to see your well-pleaded paragraphs
14:13:57  6  and if you can't point me to them, then perhaps they're not
14:14:00  7  so well pleaded, because I'm not reading a hundred
14:14:04  8  paragraphs and saying well, I kind of see it, feel it, okay.
14:14:08  9          MR. BRAMHALL:  Your Honor, admittedly there is
14:14:11 10  not a ton of information --
14:14:13 11          THE COURT:  Well, maybe admittedly you shouldn't
14:14:16 12  be arguing infringement and you should stick with your
14:14:18 13  declaratory judgment counts because you don't have a good
14:14:21 14  faith basis to assert that they have used it.
14:14:24 15          MR. BRAMHALL:  And, Your Honor, that's exactly
14:14:26 16  what we've done in our new complaint --
14:14:28 17          THE COURT:  Okay.
14:14:28 18          MR. BRAMHALL:  In the new complaint --
14:14:30 19          THE COURT:  Well, that's not what I have in
14:14:31 20  front of me and you haven't moved to amend or to supplement
14:14:35 21  or to do anything else and I'm dealing with the complaint
14:14:38 22  that's in front of me.  So maybe you fixed it going forward
14:14:41 23  but you didn't fix it here.
14:14:43 24          So Count One, the best you have is paragraph 69,
14:14:48 25  67 and what?

14:14:50  1          MR. BRAMHALL:  85 is another paragraph.  It says

14:14:52  2     Geneoscopy has its own CLIA certified laboratory -- that's a

14:14:56  3     laboratory that runs these LDT tests -- in the United States

14:14:59  4     that has performed, or will perform Exact Sciences' patented

14:15:04  5     methods using one or more of the accused products.  Again,

14:15:07  6     encompassing the LDT tests.

14:15:12  7          THE COURT:  All right.

14:15:13  8          MR. BRAMHALL:  Your Honor, we're at the pleading

14:15:15  9     stage --

14:15:16 10          THE COURT:  Are you planning to amend or

14:15:17 11     supplement this pleading now that they have received FDA

14:15:21 12     approval?

14:15:21 13          MR. BRAMHALL:  Your Honor, our intent actually

14:15:23 14     is to bring both of the complaints together through

14:15:25 15     consolidation and we actually asked counsel --

14:15:28 16          THE COURT:  That's not answering my question,

14:15:29 17     I'm asking are you planning to amend or supplement this

14:15:33 18     complaint.  Because consolidation doesn't do anything with

14:15:36 19     respect to that answer.  Right?

14:15:39 20          MR. BRAMHALL:  Sure.  So Your Honor, yes,

14:15:40 21     absolutely.  We intend to bring this complaint up-to-date

14:15:43 22     with the allegations in the other --

14:15:45 23          THE COURT:  So why didn't you say you were going

14:15:47 24     to do that so that I have to decide a motion to dismiss?

14:15:53 25     Because clearly if you did that, or asked for permission to

14:15:56  1  do that, it might moot the particular issues in this motion

14:16:00  2  to dismiss.  Right?

14:16:01  3          MR. BRAMHALL:  Your Honor, I'm happy to make

14:16:03  4  that request now.

14:16:04  5          THE COURT:  No, I think you really should have

14:16:05  6  made it before you came in.

14:16:07  7          All right.  Okay.  I think I understand Count

14:16:11  8  One.

14:16:11  9          All right.  Count Two.  Let me ask the

14:16:15 10  defendants, how is there not enough here to meet these

14:16:22 11  standards for declaratory judgment jurisdiction?

14:16:28 12          MS. BURG:  Thank you, Your Honor.

14:16:31 13          With respect to declaratory judgment

14:16:33 14  jurisdiction, Your Honor, fundamentally Exact filed this

14:16:39 15  complaint, they jumped the gun and filed too early.  All of

14:16:43 16  the accused activities which are generally contained in the

14:16:46 17  purported claim chart are part of Geneoscopy's clinical

14:16:51 18  trials that it conducted in support of its efforts to seek

14:16:55 19  FDA approval, so all of those activities are protected by

14:16:59 20  the Safe Harbor.

14:17:00 21          THE COURT:  But they don't have to argue that

14:17:02 22  they actually infringed, they're saying you are -- that

14:17:07 23  there is anticipation that you are going to and presumably

14:17:11 24  you're not getting FDA approval so that you can sit on it

14:17:15 25  and nobody could ever use the methods; right?

14:17:18  1              MS. BURG:  Well, respectfully, Your Honor, as --

14:17:23  2              THE COURT:  There is a substantial controversy

14:17:26  3   between the parties of sufficient immediacy and reality, so

14:17:33  4   you're asking for FDA approval to sell this thing.  You now

14:17:41  5   have FDA approval.  I know you say well, that doesn't matter

14:17:47  6   because they -- they filed the complaint beforehand, but why

14:17:52  7   isn't that enough?

14:17:54  8              MS. BURG:  Your Honor, so there is a couple of

14:17:55  9   things.  As you stated, first Exact jumped the gun and

14:18:01 10   didn't have jurisdiction at the time of the filing of the

14:18:03 11   complaint when FDA approval was uncertain.  Since they filed

14:18:06 12   in November, they have been saying for months that FDA

14:18:10 13   approval was imminent, but the reality is that Geneoscopy is

14:18:13 14   an innovator bringing a new technology to market, got a

14:18:18 15   breakthrough designation by FDA and ultimately did receive

14:18:21 16   that approval just on May 3rd, but that approval was not

14:18:24 17   certain from Geneoscopy's perspective and FDA approval is

14:18:30 18   never uncertain and the purpose of the Safe Harbor is to

14:18:32 19   insulate innovator Geneoscopy and drug makers as well from

14:18:39 20   potential liability from patent infringement.

14:18:41 21              THE COURT:  There is no liability from that

14:18:43 22   stuff that would be included under the Safe Harbor, it

14:18:46 23   doesn't mean that they -- that doesn't necessarily mean that

14:18:49 24   they can't sue you for declaratory judgment based on an

14:19:00 25   immediate and real controversy or, you know, a fear that

14:19:09  1    you're going to do something, right?

14:19:12  2              MS. BURG:  Well, Your Honor, we're not

14:19:14  3    contesting the concept that that could --

14:19:16  4              THE COURT:  If they were saying only that oh,

14:19:18  5    everything you did in order to get approval was what they

14:19:21  6    were basing it on, that's fine, but they're not.  They're

14:19:24  7    saying you're going to go out and tell people you're already

14:19:28  8    putting things on the website where order forms on the

14:19:32  9    website, I don't know if your client is or not, but they're

14:19:37 10    saying there are already ways that you could offer it for

14:19:40 11    sale that presumably then people would use it.

14:19:43 12              MS. BURG:  Well, Your Honor, a couple of points.

14:19:46 13    So first, I want to come back to the fact that the '781

14:19:50 14    patent only asserts method claims, that all steps must be

14:19:53 15    performed for the method to be infringed.  And what

14:19:57 16    Geneoscopy ultimately hopes to bring to market, it has not

14:20:00 17    launched yet and may not launch for quite some time, and

14:20:03 18    certainly there is no certainty as to approval as of the

14:20:07 19    time the complaint was filed in November of 2023, but

14:20:11 20    Geneoscopy at most may create a kit which Exact contends

14:20:16 21    when used may cause a patient to directly infringe by

14:20:22 22    performing all of the claimed steps of the method.

14:20:24 23              And so this is different, I think, even less

14:20:28 24    immediate than the cases from this district in *Juno* and

14:20:32 25    *Clarus* in which the district granted a motion to dismiss for

14:20:36  1    lack of immediacy where the FDA approval was pending and

14:20:41  2    prior to launch, and I think in the *Clarus* case, Judge

14:20:45  3    Andrews stated that it was to get to the point of immediacy

14:20:47  4    it had to be both approved and ultimately come to market and

14:20:51  5    those events haven't come to pass.

14:20:54  6                And here because of the nature of the claims, I

14:20:56  7    think it's even more removed and less immediate.  And

14:21:00  8    fundamentally this is a case where Exact has jumped the gun

14:21:04  9    too early by filing so early in the process when approval

14:21:08 10    was pending --

14:21:09 11                THE COURT:  You didn't move to dismiss the

14:21:10 12    lawsuit that was just filed on the same grounds?

14:21:15 13                MS. BURG:  Your Honor, we have not fully

14:21:17 14    reviewed that complaint yet, so I'm not certain of all the

14:21:21 15    allegations yet, so I don't have a position on that today.

14:21:26 16                THE COURT:  Do you think that if they were to

14:21:29 17    have filed it today, the complaint that they filed in this

14:21:36 18    case now that FDA approval has been granted, that they would

14:21:44 19    have declaratory judgment jurisdiction?

14:21:47 20                MS. BURG:  Your Honor, I still think that today

14:21:50 21    it's a stretch to say there is declaratory judgment

14:21:52 22    jurisdiction because of the amount of time it would take to

14:21:55 23    commercially launch.

14:21:56 24                THE COURT:  So there is a time requirement on

14:21:58 25    the declaratory judgment, it can't be that as soon as you

14:22:02  1    find out about the reimbursement, whether that's in a day or

14:22:06  2    in a year, you say well, gosh, because it could be nine to

14:22:11  3    twelve months, then it's not sufficiently immediate?

14:22:15  4              MS. BURG:  Yes, Your Honor.  I think there is

14:22:17  5    some case-by-case and some fact specific situations.  As

14:22:21  6    this case shows here, the *Amarin* case that we have on the

14:22:24  7    slide that FDA approval does not create declaratory judgment

14:22:27  8    jurisdiction prior to launch.  There what Judge Sleet

14:22:30  9    concluded where a complaint seeking a declaratory judgment

14:22:34 10    of patent infringement had been filed after FDA approval but

14:22:39 11    prior to product launch, and the patents at issue asserted

14:22:45 12    method claims, what Judge Sleet found was that these were

14:22:49 13    methods that would have to be conducted in the -- the

14:22:53 14    results would be in patients and those physiological

14:22:56 15    reactions had not even occurred yet, so if a product launch

14:23:00 16    date remained uncertain, the potential future infringement

14:23:03 17    was not sufficiently immediate to support the exercise of

14:23:07 18    declaratory judgment jurisdiction.

14:23:11 19              THE COURT:  Okay.

14:23:20 20              MS. BURG:  Thank you, Your Honor.

14:23:21 21              MR. BRAMHALL:  Thank you, Your Honor.  May I

14:23:22 22    respond?

14:23:23 23              THE COURT:  You may.

14:23:24 24              MR. BRAMHALL:  And Your Honor, all Exact

14:23:29 25    Sciences has done here is taken Geneoscopy at its word going

14:23:32  1    back to the original complaint.  This is some of the

14:23:35  2    evidence that we cite back from November of 2023 where

14:23:39  3    Geneoscopy has talked to the St. Louis Business Journal

14:23:42  4    about the fact that it's going to soon begin commercializing

14:23:45  5    its tests.

14:23:45  6             If we could go to the next slide.

14:23:47  7             And Geneoscopy actually repeated this statement

14:23:49  8    in a press release around the very same time, announcing

14:23:53  9    this massive deal, this Labcorp deal, where Labcorp stands

14:23:58 10    ready today to distribute its entire sales force to

14:24:02 11    distribute the product as soon as it gets the go ahead from

14:24:05 12    Geneoscopy.  This was true back in November of 2023.  There

14:24:08 13    is no question in our minds that there was jurisdiction at

14:24:11 14    the time, we were relying on what they were telling the

14:24:13 15    market and they were telling us.

14:24:14 16             With regard to these cases counsel cited, with

14:24:17 17    respect to *Amarin,* in that case it was uncertain whether the

14:24:20 18    product would ever be released.  It wasn't a question of

14:24:22 19    whether there was approval or not, it was a question of

14:24:25 20    whether the product would ever be released.  That's not the

14:24:27 21    situation here.  It's just a matter of time, Your Honor, it

14:24:31 22    is certain that the product will be released.

14:24:33 23             With respect to *Juno* and *Clarus,* these two

14:24:36 24    cases, those cases have much more uncertain allegations as

14:24:39 25    well.  Our situation is much more like the *Allergan* case in

14:24:43  1   the sense that that's a Judge Hall and Judge Andrews' case,

14:24:47  2   where there was stockpiling.  And I would argue that this

14:24:47  3   Labcorp deal is essentially the equivalent of stockpiling,

14:24:54  4   it's getting ready to infringe in a very significant way,

14:24:55  5   and so I think just without belaboring the point, Your

14:24:58  6   Honor, there is much more amnesty.

14:25:00  7             And one thing I want to point out with respect

14:25:02  8   to what Geneoscopy has been saying since our initial

14:25:05  9   complaint about approval and commercialization, if can we

14:25:09 10   get up slide number 11, please.  This is an interview in

14:25:13 11   January of this year where Erica Barnell, the CSO of

14:25:19 12   Geneoscopy, Dr. Erica Barnell, "I think we'll be able to be

14:25:23 13   in the hands of patients very shortly after FDA approval."

14:25:25 14             Your Honor, in April, as Geneoscopy was

14:25:29 15   realizing is was going to have approval, this is slide 16,

14:25:32 16   I'll tell you that last slide and this one in our new

14:25:37 17   complaint, not our old one because we weren't aware of this

14:25:40 18   evidence, this is Mr. Andrew Barnell, who is the CEO of the

14:25:45 19   company, was telling investors.  He was showing FDA approval

14:25:48 20   in 2024, followed by an immediate ColoSense product launch.

14:25:53 21   That's not what we heard today, but that's what they told

14:25:57 22   investors, and that's, Your Honor, the world we are living

14:26:00 23   in in terms of immediacy and jurisdiction.

14:26:03 24             THE COURT:  Okay.  For the defendants, give me

14:26:06 25   what your thinking is on the Lanham Act claim.  It seemed

14:26:12  1    like a lot of your motion was based on the fact that there

14:26:18  2    was not approval -- actually, before we get to the Lanham

14:26:24  3    Act, tell me about stockpiling.  Is the company making these

14:26:32  4    things, stockpiling them for sale as soon as they hopefully

14:26:37  5    get reimbursement?

14:26:41  6              MR. WARE:  Your Honor, I don't actually know the

14:26:43  7    answer to that question, but I think it's very important to

14:26:45  8    remember that this is not a patent that has anything to do

14:26:48  9    with a product.  And stockpiling a product cannot infringe

14:26:52 10    this patent.

14:26:53 11              THE COURT:  No, no, I get it.  I'm the one who

14:26:55 12    keeps saying it's not making or selling or offering to sell,

14:26:58 13    I get that.  I'm not an idiot.  But that doesn't mean that

14:27:03 14    when you're -- if your client were stockpiling the stuff in

14:27:07 15    order to sell for people to use and they would say using is

14:27:13 16    infringing, that goes into me looking at whether or not

14:27:18 17    there is declaratory judgment jurisdiction.

14:27:22 18              So that's why I asked.  Okay.  Lanham Act.

14:27:26 19              MR. WARE:  Okay.  So on the Lanham Act, I think

14:27:30 20    I would like to say something first if I may, Your Honor, on

14:27:33 21    primary jurisdiction.  And the complaint, when we received

14:27:39 22    this amended complaint with thirty0 pages of highly

14:27:43 23    technical criticisms of Geneoscopy's clinical trial data

14:27:48 24    from its phase three trial such as the size of patient

14:27:52 25    cohorts or enrollment protocols, statistical significance of

14:27:57 1    data outcomes, my first reaction was are they really asking

14:28:02 2    the Court to determine the safety and efficacy of ColoSense

14:28:06 3    rather than the FDA.

14:28:07 4          As we've seen in the briefing, the answer is

14:28:09 5    yeah, that's exactly what they're doing.  And it is very

14:28:13 6    hard for me to imagine technical issues that would be more

14:28:17 7    uniquely within the special expertise of the FDA than that

14:28:21 8    thirty pages of allegations about patient cohorts or

14:28:25 9    everything else.

14:28:25 10         The FDA has hundreds of medical professionals,

14:28:30 11   biostatisticians, that's what their job is to do.

14:28:32 12         And then on top of that, we read in footnote 93

14:28:36 13   of the Amended Complaint that they filed that they had

14:28:38 14   already filed a trade complaint in the FDA against this

14:28:43 15   product trying to persuade the FDA not to approve it.

14:28:46 16         And this case, I would say --

14:28:50 17         THE COURT:  What footnote did you tell them to

14:28:56 18   look at?

14:28:57 19         MR. WARE:  In the Amended Complaint that it was

14:29:00 20   filed, whatever day that was, footnote 93 referred to a

14:29:04 21   trade complaint --

14:29:05 22         THE COURT:  Hold on.  Stop talking until I can

14:29:08 23   find it.  I want to read it so that I understand what you're

14:29:12 24   telling me.  I got it.  It's on page 67.  It's just a URL.

14:29:21 25   So what am I doing here?

14:29:24  1          MR. WARE:  So in our -- in the exhibits attached

14:29:27  2  to our motion to dismiss, Exhibit 3, and it would be

14:29:39  3  page 67, and the footnote cites FDA's --

14:29:43  4          THE COURT:  I'm sorry.  You told me to look at

14:29:45  5  footnote 93 of the Amended Complaint?

14:29:49  6          MR. WARE:  Yes, so let me explain --

14:29:51  7          THE COURT:  So footnote 93 of the Amended

14:29:54  8  Complaint is a URL to a Facebook post.

14:29:57  9          MR. WARE:  I understand, Your Honor.  Let me

14:29:59 10  explain why there is the confusion.  The complaint that was

14:30:02 11  filed, the Amended Complaint that was filed is attached as

14:30:04 12  Exhibit 3 to Ms. Burg's declaration.  After it got filed and

14:30:08 13  we brought it to their attention and we asked them for a

14:30:12 14  copy of the trade complaint, they said, oh, that was a

14:30:15 15  mistake, we didn't mean to cite that in footnote 93.  So

14:30:19 16  they called up the clerk and said we want to replace that

14:30:23 17  complaint, Amended Complaint, with another complaint.  Okay?

14:30:26 18          So what is on the Court's record now does not

14:30:29 19  have footnote 93 that was served on us, but the point is

14:30:33 20  what was served on us told us that there was a trade

14:30:36 21  complaint in the FDA regarding Geneoscopy's promotion of

14:30:44 22  colorectal cancer screening tests in violation of the Food,

14:30:48 23  Drug and Cosmetic Act.

14:30:50 24          So that fact is not present in a lot of the

14:30:54 25  primary jurisdiction cases.  A case that we cite where

14:31:01  1    something like that was true was the *Endo* case where the

14:31:05  2    court dismissed where the plaintiff had made application to

14:31:08  3    the FDA on the same issue that it was trying to put before

14:31:12  4    the court.  The court dismissed that it would be improper

14:31:15  5    for the court to make a determination on an issue before the

14:31:18  6    FDA.

14:31:18  7              So as a matter of judicial efficiency, we don't

14:31:22  8    think it makes any sense to wade into the clinical data.  It

14:31:26  9    also, citing the *Baykeeper* factors that we run the risk of

14:31:33 10    conflicting rulings on the same questions of fact.

14:31:36 11              So now, we don't know precisely what's in that

14:31:40 12    FDA complaint because Exact refused to provide it to us.

14:31:44 13    But we think it's fair to assume given the thirty pages of

14:31:48 14    technical detail elaborating on Geneoscopy's clinical data

14:31:53 15    that probably the FDA complaint says the same thing.  And it

14:31:57 16    would have been easy for them to say oh, no, it's before the

14:32:00 17    FDA, we raised different issues.  But they chose not to.

14:32:05 18    They chose just to say oh, it was a mistake.  So we really

14:32:09 19    think that primary jurisdiction doctrine is perfectly

14:32:13 20    addressed to this problem.

14:32:15 21              And I think I also would like to emphasize a

14:32:19 22    policy point, and that is the proposition that's being

14:32:22 23    asserted here is that they can attack the reliability of the

14:32:27 24    same data that the FDA uses to determine the safety and

14:32:31 25    efficacy of this test.  And if this were true, any company

14:32:38  1    would attack after the fact the FDA's determination of

14:32:41  2    safety and efficacy of a competitor's drug or device and try

14:32:47  3    to get a jury to disagree with the FDA after the fact.

14:32:50  4         We think this would be a very bad idea, that

14:32:55  5    courts would see a flood of Lanham Act cases that would

14:32:58  6    attack a competitor's FDA approval saying oh, it's false

14:33:02  7    advertising.  The FDA, you may have said it's safe and

14:33:06  8    efficacious, but we're going to prove in court that it isn't

14:33:10  9    safe and efficacious, that would be a huge, huge expansion

14:33:14 10    of the Lanham Act.

14:33:15 11         THE COURT:  Is it really that that they're

14:33:17 12    complaining about or is it that you are saying we are better

14:33:21 13    than, that they say that your client is saying you're

14:33:25 14    superior or you're better than when that's not it.  That

14:33:27 15    seems to me to be different than just saying it's not a safe

14:33:31 16    and efficacious product, they're saying it's safe and it's

14:33:35 17    not.

14:33:35 18         MR. WARE:  I would submit, Your Honor, that

14:33:37 19    they're saying both, they're absolutely saying both and

14:33:41 20    their FDA trade complaint also put the issue of promotion in

14:33:44 21    front of the FDA.  They are saying both.

14:33:46 22         Now, as far as that goes, when we talk about the

14:33:50 23    elements of the Lanham Act claim, we do address that and

14:33:52 24    what they're complaining about is a statement about the

14:33:56 25    data, the sensitivity data that was in the Journal of

14:34:01  1    American Medical Association.  And Geneoscopy said that was

14:34:04  2    the highest that had been reported of any such test.

14:34:09  3             The journal itself where that was drawn from

14:34:13  4    specifically said there was no head-to-head comparison.  And

14:34:17  5    that's really what they're complaining about is false and

14:34:21  6    misleading.  They're saying well, that Geneoscopy is

14:34:23  7    implying that there was a head-to-head comparison and yet

14:34:28  8    the very data, the very source of data that we refer to,

14:34:31  9    that we refer the reader to said there was no head-to-head

14:34:35 10    comparison, it's just that number is higher than the number

14:34:38 11    that came out of their clinical trial.  That's it.  But in

14:34:41 12    any case, they put that issue before the FDA as well.

14:34:43 13             THE COURT:  All right.  Let me hear from the

14:34:48 14    plaintiff on those issues first.

14:34:50 15             MR. WARE:  Okay.  Great.  Thank you.

14:34:52 16             THE COURT:  So this mysterious trade complaint

14:34:55 17    that you all referred at and then took back, but apparently

14:34:58 18    it exist.  Right?

14:34:59 19             MR. BRAMHALL:  It does exist, Your Honor.

14:35:01 20             THE COURT:  Tell me what is being asserted here

14:35:04 21    that is not -- don't tell me what's in there, in the trade

14:35:08 22    complaint, tell me what is here that is not also asserted in

14:35:13 23    the trade complaint.

14:35:14 24             MR. BRAMHALL:  So what is at issue here, Your

14:35:16 25    Honor, are Lanham Act claims that are about commercial

14:35:19  1   promotion --

14:35:20  2                THE COURT:  No, no, no, tell me what the basis

14:35:22  3   is.  I know, because I take his point, he's like look, if

14:35:26  4   you just are going to get to go in and say they lied, they

14:35:31  5   lied, and the FDA is the one who is determining whether it's

14:35:35  6   safe and efficacious, I don't want to really open up the

14:35:39  7   Lanham Act claim saying my product is safe and efficacious.

14:35:43  8   So I defer to the FDA on some of that.  Don't tell me the

14:35:47  9   Lanham Act is different from what FDA does, tell me what

14:35:51 10   assertions you have, what complaints you have that are not

14:35:56 11   in the mysterious trade complaint that nobody seems to know

14:36:00 12   what's in but you all.

14:36:01 13                MR. BRAMHALL:  So the mysterious trade complaint

14:36:04 14   Your Honor, is about safety and efficacy of the ColoSense

14:36:08 15   test and claims surrounding that --

14:36:11 16                THE COURT:  What is not -- tell me what in the

14:36:14 17   current one is not in the trade complaint.

14:36:16 18                MR. BRAMHALL:  So the complaints in this -- our

14:36:18 19   allegations in this complaint are much more robust.  That's

14:36:21 20   a short letter, Your Honor, it's a handful of pages --

14:36:25 21                THE COURT:  Just tell me, show me, give me some

14:36:29 22   assertions here.

14:36:32 23                MR. BRAMHALL:  So, Your Honor, it's right to

14:36:34 24   focus on -- so the trade complaints, there is overlap, we're

14:36:38 25   not denying that, but that doesn't mean Your Honor should

14:36:42  1   abstain from jurisdiction --

14:36:44  2           THE COURT:  Let's put it this way.  I am not

14:36:46  3   dealing with stuff that is in front of the FDA.  So if you

14:36:49  4   don't want me to dismiss your Lanham Act claims, you better

14:36:53  5   point me to something that you can represent to me is not

14:36:57  6   before the FDA on the trade complaint.

14:37:00  7           MR. BRAMHALL:  So, Your Honor, I don't think the

14:37:02  8   --

14:37:02  9           THE COURT:  Point me to some allegations.

14:37:05 10           MR. BRAMHALL:  Your Honor, I don't think the

14:37:06 11   trade complaint is in front of the FDA at all because the

14:37:08 12   product has been approved, so the product has been approved,

14:37:11 13   that puts this whole thing to rest.  But that doesn't

14:37:14 14   address, Your Honor, the past commercial marketing that they

14:37:17 15   were doing that was false and misleading including with the

14:37:21 16   superiority claims.  We're entitled, Your Honor, to seek

14:37:23 17   remedy --

14:37:24 18           THE COURT:  Are you going to argue that it's

14:37:26 19   false and misleading to say that their product is safe and

14:37:29 20   efficacious?

14:37:29 21           MR. BRAMHALL:  No, we're not, Your Honor.

14:37:31 22   That's not at all what we're arguing.  We're arguing about

14:37:34 23   the representations that they're making to the commercial

14:37:37 24   public about their test versus our test which are not

14:37:39 25   supported by -- these are classic, Your Honor, establishment

14:37:42  1    claims under *Southland Sod*, they are completely permissible

14:37:43  2    and there is no reason why Your Honor should advocate your

14:37:48  3    jurisdiction here.  The *POM Wonderful v. Coca-cola* case

14:37:53  4    makes very clear that the FDA and the Lanham Act are

14:37:56  5    separate and complimentary.

14:37:58  6            THE COURT:  It doesn't matter to me.  If you

14:38:00  7    were saying we're going after -- I get it, they're two

14:38:04  8    separate statutes, but that doesn't mean that I'm going to

14:38:08  9    go out of my way to say I have jurisdiction over claims if

14:38:13 10    it's something like the safety and efficacy.

14:38:16 11            MR. BRAMHALL:  It's absolutely not.

14:38:19 12            THE COURT:  That's why I'm asking you.  Don't

14:38:21 13    just tell me, Your Honor, they're different statutes, so

14:38:24 14    you're stuck, you got to deal with it because we asserted

14:38:27 15    it, that's not where you're going to get me.  Okay?  I'm

14:38:30 16    asking you what's different and I'm assuming that you're

14:38:33 17    saying what's different is they made claims of superiority.

14:38:39 18            MR. BRAMHALL:  Yes, that's correct.  In

14:38:43 19    commercial promotions to physicians and others in a way that

14:38:48 20    is deceiving to them and we've been harmed as a result, both

14:38:54 21    in the past and prospectively we have been harmed by these

14:38:57 22    claims, which they continue to make.  They literally are

14:39:01 23    making these claims today at a conference called DDW,

14:39:06 24    Digestive -- I'm not going to be able to get the acronym,

14:39:09 25    but it's a conference literally today where we saw reporting

14:39:12 1    from yesterday where they're making the same misleading

14:39:15 2    claims where they're claiming a hundred percent sensitivity

14:39:19 3    and not saying, Your Honor, they are omitting the key

14:39:19 4    information that there are only five cancers that that's

14:39:22 5    based on, there is an N equals five, and statistically

14:39:25 6    that's a very misleading and false claim to make because it

14:39:29 7    suggest to a user, a physician, that this test is perfect

14:39:32 8    and they must have had a statistically powered study when

14:39:37 9    they didn't.  That's the nature of our Lanham Act claims,

14:39:39 10   Your Honor.

14:39:40 11          THE COURT:  Okay.  And you're saying the FDA at

14:39:44 12   this point is out of it, so even if we were to assume that

14:39:48 13   the FDA had primary jurisdiction, there is nothing for the

14:39:51 14   FDA to decide right now.

14:39:52 15          MR. BRAMHALL:  They're going to deal with the

14:39:54 16   label, Your Honor, and the safety and efficacy.  We're

14:39:57 17   dealing with the commercial promotion and the harm to us.

14:39:59 18   That's what we're doing, which is exactly what the Lanham

14:40:02 19   Act is for.

14:40:02 20          THE COURT:  All right.  Let me hear from

14:40:05 21   Mr. Ware on that point.

14:40:10 22          MR. WARE:  So first of all, on that point, what

14:40:13 23   you just heard was actually that through the Lanham Act they

14:40:17 24   want to challenge the safety and efficacy --

14:40:20 25          THE COURT:  No, what I heard was they're

14:40:23  1    complaining that there are statements made that are not

14:40:26  2    supported as to whether -- I'm not saying whether this is

14:40:32  3    true or not, this is the allegations.   There are statements

14:40:36  4    being made, including as of yesterday, that this product is

14:40:39  5    superior to their product.

14:40:41  6           MR. WARE:  All right.  So let me address that.

14:40:43  7    So the issue -- that issue we believe, and they certainly

14:40:47  8    didn't deny that that issue is also before the FDA.   The

14:40:50  9    trade complaint that they filed was a trade complaint

14:40:54 10    against promotional activities of Geneoscopy.  The FDA has

14:41:00 11    statutory jurisdiction to consider claims that promotional

14:41:05 12    activities including comparative advertising are unlawful,

14:41:10 13    and that's 21 CFR 202.1(e)(6).

14:41:15 14           THE COURT:  Right.  But I have had cases in the

14:41:17 15    past where there is an assertion from the FDA that there was

14:41:24 16    an improper comparison and you get a letter, I forget what

14:41:28 17    they're called, but you get a letter from the FDA saying you

14:41:31 18    can't make that superiority claim, that's not supported by

14:41:34 19    the clinical data.  That doesn't preclude a Lanham Act claim

14:41:38 20    because in those cases where I have seen those most usually

14:41:42 21    there was a Lanham Act assertion.

14:41:44 22           MR. WARE:  Well, I think what makes this case

14:41:46 23    different, perhaps, is that that issue is actually pending

14:41:49 24    before the FDA right now.

14:41:50 25           THE COURT:  It's not pending before the FDA

14:41:53  1    because the FDA is not doing anything because you have

14:41:56  2    approval.

14:41:57  3             MR. WARE:  Well, if I may, Your Honor, what he

14:42:00  4    said was the issue of safety and efficacy was not before the

14:42:03  5    FDA.  He did not say the issue of comparative advertising is

14:42:07  6    not before them.

14:42:07  7             THE COURT:  Right.  Is the issue of comparative

14:42:11  8    advertising in the trade letter?

14:42:13  9             MR. BRAMHALL:  Comparative advertising?

14:42:15 10             THE COURT:  The stuff that you just told me, the

14:42:17 11    comparative advertising where they're saying their product

14:42:20 12    is better than yours, is that in the trade letter?

14:42:22 13             MR. BRAMHALL:  Yeah, in the context of safety

14:42:25 14    and efficacy, that's what we're dealing with, that was about

14:42:28 15    approval.  That's what we are addressing.  Your Honor, this

14:42:31 16    was back in November.  This hasn't gone anywhere.  We're

14:42:35 17    coming to Your Honor to have our harms addressed including

14:42:38 18    again for pre-approval advertising, that was widespread and

14:42:42 19    that again, continues to this day.

14:42:44 20             MR. WARE:  Well, in other words, it is before

14:42:46 21    the FDA, they haven't acted on it.  It's exactly the same

14:42:50 22    issue that they would like to put before this judge.

14:42:52 23             THE COURT:  But I'm sorry, isn't the trade

14:42:55 24    letter -- is he correct that the trade letter was seeking to

14:42:59 25    keep approval from happening?  And so if that's the case,

14:43:03  1    now that approval has been granted, isn't it -- it doesn't

14:43:10  2    sound like there is anyone active on that letter.

14:43:13  3         MR. WARE:  First of all, we haven't seen it, so

14:43:15  4    I can't really speak to that.  But what it was addressing,

14:43:17  5    it was addressing two things.  It was addressing safety and

14:43:20  6    efficacy which they sought to persuade the FDA wasn't there,

14:43:24  7    and it was addressing the promotional activities, the

14:43:28  8    pre-approval promotional activities that you have just been

14:43:31  9    hearing about, it says so explicitly in the title.

14:43:34 10         THE COURT:  And presumably they're going to

14:43:37 11    amend and supplement their complaint, not just pre-approval

14:43:41 12    activities that they're complaining about, apparently you

14:43:43 13    all keep saying it and that's not pre-approval.  Anything,

14:43:47 14    assuming that what was represented to me happened yesterday,

14:43:51 15    that's not pre-approval, right?

14:43:53 16         MR. WARE:  I know absolutely nothing about that.

14:43:56 17    I know in the press release they put out, they made no such

14:44:01 18    statement, so I don't believe it's actually true.  But

14:44:04 19    whether it's pre-promotional or simply promotional activity,

14:44:07 20    the FDA has jurisdiction over the issues pending before

14:44:08 21    them.  I would suggest that Exact provide us and the Court a

14:44:12 22    copy of the letter and we could address this in a more

14:44:15 23    sensible way.

14:44:17 24         THE COURT:  Why didn't you give them a copy of

14:44:19 25    it?  Why did you just say we're taking out that footnote and

14:44:24  1    switching out the footnote so I didn't see it?  How come you

14:44:27  2    didn't give me that?

14:44:28  3                MR. BRAMHALL:  Your Honor, it was not intended

14:44:31  4    to be part of the complaint.  It was included in error.

14:44:33  5    It's not part of our allegations.

14:44:35  6                THE COURT:  I know it's not part of your

14:44:38  7    allegations, it's part of why they say I shouldn't exercise

14:44:41  8    jurisdiction over the Lanham Act claim, and now you didn't

14:44:43  9    even give them a copy.  And he's just saying, I don't even

14:44:47 10    know what to tell you, judge.  Everything before you could

14:44:50 11    be in front of the FDA.  They won't even give me a copy of

14:44:53 12    it.  You don't even know that it's just a short letter, do

14:44:56 13    you, Mr. Ware?

14:44:57 14                MR. WARE:  I don't.  I don't.  It might be

14:45:00 15    thirty pages long.

14:45:01 16                THE COURT:  It shouldn't be that hard.  How come

14:45:03 17    you didn't give it to him?

14:45:06 18                MR. BRAMHALL:  We didn't think it was relevant,

14:45:08 19    Your Honor, even if she had raised the exact same issues --

14:45:12 20                THE COURT:  I get it, you're saying you still

14:45:14 21    have an argument and I'm saying it's a less persuasive

14:45:18 22    argument to me.  I keep asking you, what's in the complaint

14:45:21 23    that's not in the letter?  And I'm not sure that I actually

14:45:24 24    know except that you told me that there are post approval

14:45:27 25    statements that you want to assert, but those are not in the

14:45:31  1    First Amended Complaint because the First Amended Complaint

14:45:33  2    was filed prior to approval.

14:45:34  3            MR. BRAMHALL:  Exactly, Your Honor.  And the

14:45:36  4    issue is, that was in November.  There have been a whole

14:45:39  5    slew of additional ads that have been raised.  We have not

14:45:42  6    gone back to the FDA as far as I am aware.  We're here with

14:45:48  7    Your Honor as far as the Lanham Act, that's where we think

14:45:48  8    it should be adjudicated from the commercial harm

14:45:50  9    standpoint.  Again, we're not challenging the efficacy and

14:45:52 10    safety, that's not what we're doing with this claim.

14:45:55 11            MR. WARE:  I don't think any of the statements

14:45:56 12    about the so-called advertising, I don't think they're true

14:45:59 13    to begin with, but nevertheless they're certainly not before

14:46:02 14    the Court, they're not in any pleading.  We are here on a

14:46:05 15    12(b)(6) motion to dismiss this pleading.  They're also not

14:46:10 16    in the new complaint that was just filed.

14:46:12 17            MR. BRAMHALL:  Your Honor, there is not a single

14:46:14 18    case cited by our opposition that says simply sending a

14:46:18 19    letter to the FDA deprives you of jurisdiction.  I don't

14:46:21 20    think there is a case, and we have --

14:46:23 21            THE COURT:  No, but when their argument is that

14:46:27 22    the FDA does have jurisdiction, and he does get some

14:46:30 23    resonance with me saying really, we're going to have

14:46:32 24    parallel proceedings, maybe you're not arguing safety and

14:46:36 25    efficacy, but do I want to open up, open up the gates for

people to make those arguments and start making Lanham Act
claims out of really what shouldn't be Lanham Act claims but
should be issues for the FDA to determine?

MR. BRAMHALL:  I think with all due respect,
Your Honor, I think these are strictly --

THE COURT:  Whenever someone says "with all due
respect," I don't really take it as meaning that you're
saying that, so don't start that way.  Okay?

MR. BRAMHALL:  Your Honor, the way I see it is
Your Honor is particularly well situated to address these
kind of issues that are commercial in nature, not about the
safety and efficacy, these are strictly -- the Lanham Act
claims go to Your Honor for a reason.  Your Honor, if they
would stop making these claims, perhaps we would rethink
this Lanham Act claim, but the reality is they're not so we
have to do something about it.  So we're availing our rights
under the Lanham Act.

MR. WARE:  Let me talk for a moment --

THE COURT:  Let's stick with what's in the
complaint because that's really what I have to base this on.
If you're telling me, Your Honor, I can supplement, Your
Honor, I can amend, okay, but that's not helping me with
what's in your complaint that is in front of me.

MR. BRAMHALL:  And, Your Honor, I'm happy to
explain.  So if we back up for a moment, we have a series of

14:47:54  1    different false advertising claims.  There are a number of

14:47:56  2    them that are establishment claims that are under *Southland*

14:48:00  3    *Sod* and there are two bases for that.  One is premised on

14:48:02  4    the unreliability of the study.  That's one bucket.  The

14:48:05  5    second bucket is assuming the study is reliable, the claims

14:48:08  6    that they're making are not supported by any study.  So

14:48:11  7    that's a totally different issue than even evaluating the

14:48:15  8    study from a reliability perspective, those are absolutely

14:48:18  9    in the case.

14:48:18 10         THE COURT:  What I'm not sure about, when you

14:48:20 11    say reliability and sensitivity, are those really claims of

14:48:24 12    -- I understand when it's a comparison, but if they say our

14:48:28 13    product is, you know, this sensitive, are you really there

14:48:31 14    saying it's just not even sensitive enough that it works?

14:48:35 15         MR. BRAMHALL:  So I think, Your Honor, they're

14:48:37 16    making clinical claims about sensitivity, for example,

14:48:40 17    saying it's a hundred percent, saying it has no false

14:48:42 18    negatives whatsoever, but then it's based on an N of five.

14:48:46 19    I think that's inherently false and misleading, because the

14:48:50 20    reader needs to know that this is not a clinical performance

14:48:54 21    claim that they can rely on.  It's just not statistically

14:48:59 22    backed, Your Honor.

14:49:00 23         MR. WARE:  Your Honor, if I may as to that

14:49:02 24    specific point just to put it in some context, what he's

14:49:06 25    talking about is an age cohort between age 45 and 49 and

14:49:10  1    that's part of what they're seeking approval on.  And Exact

14:49:14  2    wants to argue that the size of their cohort wasn't enough

14:49:18  3    to make that -- to make that data reliable.  That's exactly

14:49:23  4    what the FDA considers when they decide whether the label

14:49:26  5    can cover people who are age 45 through 49.  So the idea --

14:49:31  6           THE COURT:  Let me ask you this.  Then if the

14:49:35  7    label doesn't include that information and your client

14:49:41  8    continues to say it, does that mean that what, they're not

14:49:46  9    allowed to say that you're falsely advertising?

14:49:52 10           MR. WARE:  I think the label sets up all the

14:49:54 11    data.  The data says how many people are in every cohort.

14:49:58 12           THE COURT:  Does the label let them say with

14:50:01 13    hundred percent among individuals age 45 to 49, sensitivity

14:50:07 14    was 100 percent among individuals?  You're saying well, the

14:50:11 15    data is in there, somebody could see that.

14:50:15 16           MR. WARE:  I think that my recollection is that

14:50:17 17    when you have a label, it also sets out in appendices what

14:50:21 18    all the data is that supports it.  But for him to argue that

14:50:27 19    that's not challenging the safety and efficacy, if the FDA

14:50:31 20    is deciding --

14:50:32 21           THE COURT:  Yeah, but this is a motion to

14:50:34 22    dismiss.  I mean, at some point -- I can't make these, you

14:50:41 23    know, very detailed determinations on a motion to dismiss.

14:50:45 24    He's saying, I'm not challenging the safety and efficacy.

14:50:50 25    If he came back and it was summary judgment, maybe I would

14:50:54 1    understand what the arguments were being made and then I

14:50:57 2    would know that he was wrong.  This is a motion to dismiss.

14:50:59 3              MR. WARE:  Right.

14:51:00 4              THE COURT:  He's got stuff in there saying these

14:51:02 5    claims are false, not that the product doesn't work at all,

14:51:06 6    not that people are going to be injured or harmed if they

14:51:09 7    use it, but that these claims, which have been reported and

14:51:16 8    repeatedly made outside of the FDA, are false.

14:51:22 9              MR. WARE:  No, because, I'm sorry, Your Honor,

14:51:24 10   but the FDA wouldn't approve, they wouldn't approve a label

14:51:28 11   for a particular age cohort unless they reached a conclusion

14:51:33 12   --

14:51:33 13             THE COURT:  No, no, no, the FDA doesn't require

14:51:35 14   you to show that it's a hundred percent sensitive for a 45

14:51:38 15   to 49 in order to approve it for that cohort, right, it

14:51:42 16   could be 85 percent and the fact is it might still be useful

14:51:47 17   and helpful.  Right?

14:51:49 18             MR. WARE:  What they have to do is they have to

14:51:51 19   decide that you have sufficient support for age 45 to 49 --

14:51:55 20             THE COURT:  Right.  And you are saying, assuming

14:51:57 21   your client is saying this, your client isn't just saying we

14:52:01 22   work and got approval in the 45 to 49 range, your client is

14:52:07 23   saying in fact in this range we had 100 percent sensitivity,

14:52:14 24   nothing -- no -- not going to miss anything.  And they're

14:52:18 25   saying, why can't we argue that that is false, especially

14:52:23  1    when you're going to keep saying it.  I'm just saying what

14:52:29  2    their assertion is.

14:52:30  3            MR. WARE:  Well, I go back to where I started

14:52:33  4    that I assume this is what they're arguing in the trade

14:52:35  5    complaint as well because they're complaining about

14:52:37  6    promotional activities and I assume that's one of the things

14:52:40  7    they're complaining about, so it would be very helpful if we

14:52:43  8    saw the letter and we can look at that.

14:52:45  9            Now, I can turn to a different subject on Lanham

14:52:47 10    Act which might be another way to go on this which is simply

14:52:51 11    that we don't believe that Exact at the time that they filed

14:52:56 12    the complaint had Article III standing to bring a Lanham Act

14:53:00 13    case.  Again, this goes back to the FDA approval and the

14:53:04 14    uncertainty of FDA approval, but there is no case that's

14:53:06 15    been cited that has said that a party can bring a Lanham Act

14:53:13 16    case complaining about proximate -- harm proximately caused

14:53:20 17    by commercial advertising in the case of a party who does

14:53:23 18    not have an approved device, does not have a product on the

14:53:28 19    market.

14:53:28 20            So there is a -- there is a threshold question

14:53:35 21    of was there Article III standing when they brought this

14:53:38 22    case.  It's not a question of whether they might have

14:53:42 23    Article III standing now, but in November of 2023.  We

14:53:49 24    submit they did not have Article III standing to bring a

14:53:52 25    Lanham Act claim, again, to jump the gun long before there

14:53:56  1    is a product on the market, before anybody knows there is --

14:54:00  2    whether a product will be approved, there probably won't be

14:54:04  3    a product until the end of 2024, 2025, if at the earliest,

14:54:09  4    and so in November of 2023, the courts would say no, there

14:54:15  5    is no -- there is no standing to bring a Lanham Act action

14:54:19  6    at that time.

14:54:22  7            Parties are supposed to wait and see whether

14:54:24  8    there is actually competition in a market, whether somebody

14:54:27  9    is actually advertising, whether somebody is actually

14:54:31 10    seeking to influence purchasers.  All we had in this case is

14:54:36 11    Geneoscopy saying we've applied for FDA approval.  We have a

14:54:40 12    product.  Here is the Journal of American Medical

14:54:43 13    Association report of our clinical trial.  We think the data

14:54:46 14    is very good.

14:54:47 15            So I submit that there is no Article III

14:54:50 16    standing at the time.  And, you know, we have made -- set

14:54:58 17    out some of the other elements of a Lanham Act case

14:55:01 18    including materiality including actually advertising to a

14:55:05 19    target audience, actually causing deception to that

14:55:11 20    audience, there is no allegation that supports those kinds

14:55:14 21    of elements either.

14:55:17 22            I know we've taken a lot of time and we've

14:55:19 23    addressed these in the brief.  I'm happy to answer any

14:55:22 24    questions about them, but I wasn't going to go through them

14:55:25 25    one by one.

14:55:26    1          THE COURT:  All right.  Thank you.

14:55:27    2          Let me hear from you on standing.  And if you do

14:55:32    3    file an Amended Complaint, maybe your date would go back to

14:55:35    4    the date of the original complaint, but if you filed a

14:55:38    5    supplemental complaint, my understanding is any new

14:55:42    6    information would get the date that the supplemental

14:55:45    7    complaint was filed.  Do I have that right?

14:55:47    8          MR. BRAMHALL:  You know, Your Honor, we looked a

14:55:49    9    lot into both of these issues.  I think it would be some

14:55:52   10    mixture of a supplemental and Amended Complaint denied

14:55:56   11    depending on the allegations that we bring.  I believe that

14:55:59   12    is correct.  It is a confusing area of law, I will admit.

14:56:03   13          On the standing issue, can we get slide 21, I'll

14:56:07   14    deal with this briefly, Your Honor.  From our perspective,

14:56:09   15    the Lanham Act specifically contemplates prospective

14:56:14   16    damages, from our perspective there is no issues with

14:56:16   17    standing.  One, this is a 12(b)(6) issue, not a 12(b)(1)

14:56:20   18    issue, so Your Honor can accept our allegations as well pled

14:56:23   19    and as true.

14:56:24   20          With respect to this particular issue, there

14:56:26   21    were advertisements going back, these kind of

14:56:30   22    advertisements, they started back in October.  And I think

14:56:32   23    we have a couple of examples here on slide 23.  For example,

14:56:37   24    slide 24, so before November of 2023, they were making these

14:56:43   25    kind of claims, these advertising claims about the high

14:56:46  1   sensitivity that compared the superiority claims that we

14:56:51  2   have an issue with, all the way back then prior to our first

14:56:54  3   complaint, so I don't think there is a real question here,

14:57:00  4   Your Honor.

14:57:00  5          THE COURT:  All right.  Anything further from

14:57:01  6   the defendants?  Do you want to say on anything that maybe I

14:57:09  7   cut you off and did not let you say?

14:57:11  8          MR. WARE:  No, Your Honor has been very generous

14:57:13  9   with our time.  We've gone way past your time and I think

14:57:17 10   Your Honor has the issue.

14:57:18 11          THE COURT:  Thank you.  Anything further from

14:57:19 12   the plaintiff?

14:57:20 13          MR. BRAMHALL:  I don't think so, Your Honor.

14:57:21 14          THE COURT:  All right.  So I have before me

14:57:23 15   defendant's motion to dismiss each of the counts of the

14:57:27 16   complaint.  With respect to Count One, which asserts direct

14:57:32 17   infringement, I will dismiss that.  I will dismiss it

14:57:35 18   without prejudice, but I don't think that the complaint -- I

14:57:39 19   think it's sloppily drafted and is talking about offering to

14:57:43 20   sell and making sales when the product hasn't been sold.

14:57:47 21   Perhaps there have been offers to sell, but all of the

14:57:51 22   claims in this patent as being asserted are method claims,

14:57:56 23   and so I just don't see that there is sufficient pleading in

14:58:01 24   there to assert direct infringement.

14:58:03 25          I will deny the motion to dismiss with respect

14:58:06  1   to Count Two, which is declaratory judgment, assertions of

14:58:15  2   declaratory judgment infringement.  And there I do think

14:58:25  3   that there are sufficient facts alleged to create an actual

14:58:29  4   case or controversy.  I think the plaintiff has pleaded

14:58:34  5   sufficient facts showing a dispute concerning infringement

14:58:37  6   that is of sufficient immediacy and reality to warrant the

14:58:41  7   issuance of declaratory judgment.

14:58:43  8        Geneoscopy keeps stating apparently, and even

14:58:46  9   has before this complaint was filed that it's prepared to

14:58:51 10   immediately launch the product upon FDA approval.  I

14:58:55 11   understand that counsel has represented that there is

14:58:59 12   another step involved, but I think that there is sufficient

14:59:03 13   immediacy that has been alleged, including that it signed a

14:59:08 14   multiyear agreement with Labcorp to distribute the test upon

14:59:14 15   FDA approval.  So I am going to deny that.

14:59:18 16        With respect to the Lanham Act claims, on this

14:59:21 17   one, I am sort of torn, but I do think that I guess this

14:59:27 18   would be Counts Three through Five, really.  I do think that

14:59:32 19   there is probably a sufficient amount of well-pleaded

14:59:40 20   allegations to get to a Lanham Act claim.  Perhaps not the

14:59:46 21   strongest of Lanham Act claims, but I think that it meets

14:59:54 22   the standard at this point.

14:59:56 23        As to standing, I do think that standing has

14:59:59 24   probably been sufficient standing, Article III standing.  I

15:00:05 25   think it's also kind of a sliding scale what is necessary at

15:00:08 1    a particular time.  You need more as you get further along

15:00:12 2    in the case and I think that what they've done here is

15:00:15 3    sufficient for the motion to dismiss stage.

15:00:21 4            Okay.  So that is my ruling, the motion is

15:00:31 5    granted in part, denied in part.  Plaintiff apparently is

15:00:35 6    going to be filing an amended or a supplemental or part or

15:00:42 7    both, pleading in the near future, and there is a question

15:00:48 8    about consolidation.  Does defendant have a position on

15:00:51 9    whether these cases should be consolidated?

15:00:55 10           MR. WARE:  Your Honor, I believe that the case

15:00:59 11   was just filed on Friday.  I was traveling.  We haven't even

15:01:03 12   discussed it with the client.  I haven't even read it

15:01:05 13   actually to know what's in it.

15:01:07 14           THE COURT:  I tried to pull it up, but I

15:01:09 15   couldn't get access today.

15:01:10 16           MR. WARE:  May I ask one thing, Your Honor, just

15:01:13 17   in connection with the Lanham Act, since I do think the

15:01:15 18   issue of primary jurisdiction is important, could we request

15:01:19 19   that the plaintiffs provide us a copy of the trade

15:01:23 20   complaint.

15:01:23 21           THE COURT:  Yes.  Provide them with the trade

15:01:26 22   complaint.

15:01:27 23           MR. WARE:  Thank you, Your Honor.

15:01:30 24           THE COURT:  All right.  Anything else that we

15:01:34 25   need to discuss while we're here?

15:01:37  1              MR. BRAMHALL:  I don't think so, Your Honor.

15:02:16  2              MS. BURG:  Nothing further from defense, Your

15:02:19  3   Honor.

15:02:19  4              THE COURT:  All right.  Thank you, everyone.

15:02:20  5   Have a good rest of the week.

15:02:23  6              COURT CLERK:  All rise.  Court is adjourned.

15:02:32  7              (Court adjourned at 3:02 p.m.)

          8

          9         I hereby certify the foregoing is a true and
              accurate transcript from my stenographic notes in the proceeding.
         10

         11                              /s/ Dale C. Hawkins
                                         Official Court Reporter
         12                               U.S. District Court

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25